UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re matter of search of:                )
                                          )
xxxxxxxxxxxxxxxxxxxxxxxxxxxx              )
WASHINGTON, D.C. 20019                    )

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT AND SEARCH WARRANT

I, Darin W. Ramsey, being duly sworn, depose and state that:

1.  I am a Special Agent with the United States Department of Justice, Bureau of Alcohol,

Tobacco, Firearms and Explosives and have been so employed since July 2000.  As an ATF Special

Agent I have participated in numerous firearms and narcotics investigations and in the execution of

numerous federal, state and local search warrants and as such am familiar with various types of

firearms, firearm parts, ammunition, controlled substances and their methods of distribution, records

and receipts found on the premises of individuals who have purchased, possess, and/or sell firearms

and are involved in the sale, distribution and/or transportation of controlled substances.

1.  The facts and information contained in this affidavit are based upon my personal

knowledge, information obtained from federal and state law enforcement officers and information

obtained from cooperating witnesses.  All observations referenced in this affidavit that were not

made by me were related to me by the person who made such observations.  As to those identified

as law enforcement employees, I am aware they have training and experience in criminal

investigations, I have worked with them in the past and have found their information to be reliable

and accurate.

2.  This affidavit is made in support of an application for a search warrant for the premises

known as xxxxxxxxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON, D.C. 20019.  This property is

described as a single-story ranch-style house. The lower half of the house is red brick and the upper half is stone. The front door is wood-colored and has a black metal security covering it and the number "xxxx" is displayed to the right of the front door to the residence in black numbers. This property is the residence of Daniel (Danny) Lively, Eva Warren and others.

    3.   On or about August 29, 2005, law enforcement officers obtained information that Tiffany Russell and Danny Lively were distributing quantities of cocaine hydrochloride and cocaine base, commonly known as "crack cocaine," in the Eastern District of Virginia. Specifically, an ATF Confidential Informant (hereinafter referred to as "CI") reported that he/she purchased crack cocaine and powder cocaine from Tiffany Russell and/or Danny Lively from approximately January 2004 to the summer of 2005. The CI explained that Danny Lively and Tiffany Russell are in a romantic relationship. The CI also reported that Danny Lively was incarcerated in facilities located in Texas and North Carolina for approximately eight months sometime between January 2004 to the summer of 2005.

    4.   Law enforcement records disclose that Daniel Lively was arrested on or about November 23, 2004, in Texas on a parole violation warrant issued by the United States District Court for the District of Columbia.

    5.   In or about May 2005, a Richmond grand jury for the United States District Court for the Eastern District of Virginia returned an indictment charging Daniel Lively with possession with the intent to distribute five grams or more of cocaine base, in violation of Title 21, United States Code, Section 841, possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c) and being a felon in possession of a firearm, in violation of

Title 18, United States Code, Section 922(g). This indictment relates to conduct occurring in or about November 2003.

6.   From on or about September 1, 2005, and September 28, 2005, Tiffany Russell distributed powder cocaine and crack cocaine on approximately five occasions to a law enforcement officer working in an undercover capacity (hereafter referred to as "UC") and/or the CI in Manassas, Virginia. In total, Russell distributed approximately 27.9 grams of cocaine hydrochloride and 60.6 grams of cocaine base to the UC and the CI.

7.   On or about October 3, 2005, the United States District Court for the Eastern District of Virginia issued a criminal complaint and arrest warrant charging Tiffany Russell with distribution of five grams or more of crack cocaine, in violation of Title 21, United States Code, Section 841.

8.   On or about October 4, 2005, the CI placed a recorded telephone call to Tiffany Russell and arranged to meet with Tiffany Russell in Manassas, Virginia, to purchase approximately 42 grams of crack cocaine the following day.

9.   On or about October 5, 2005, law enforcement officers arrested Tiffany Russell in Manassas, Virginia. Subsequent to her arrest law enforcement officers seized approximately 80 grams of suspected crack cocaine and approximately 26 grams of suspected cocaine from Tiffany Russell's vehicle. Law enforcement officers field-tested the suspected crack cocaine and cocaine, which tested positive for cocaine.

10. On or about October 5, 2005, law enforcement officers executed a search warrant, issued by the United States District Court for the District of Maryland, at Tiffany Russell's residence located in Hyattsville, Maryland. Law enforcement officers seized approximately 135 grams of suspected crack cocaine, approximately 45 grams of suspected cocaine, approximately 132 grams

of suspected marijuana, 9mm caliber ammunition and a holster.

11. Additionally, officers seized numerous letters addressed to Tiffany Russell from Daniel Lively mailed from correctional institutions in Texas and North Carolina between December 2004 and June 2005. In these letters, Daniel Lively admits that he is involved with "selling drugs" and "hustling." The letters also indicate that Tiffany Russell is "getting shit done" and "tak[ing] care of things out there for" Daniel Lively while Lively was incarcerated. In the letters, Daniel Lively instructs Tiffany Russell how much to distribute, to whom and how much to charge the individuals for these illegal narcotics. Based upon my training and experience and considering Lively's criminal record and Russell's criminal activity with the CI and the UC, your affiant understands the expressions "hustling," "getting shit done" and "tak[ing] care of things out there" to mean that Russell is trafficking in drugs.

12. Daniel Lively also tells Tiffany Russell in these letters to "start putting money in the bank" and notes that because Russell is not a United States citizen, "the IRS or anybody can [*sic*] even say anything about it." He warns Russell not to give her name when calling to inquire about setting up bank accounts. Daniel Lively suggests that he may be able to use a safe deposit box for safekeeping their money and indicates that the two (Lively and Russell) have approximately $22,000 saved.

13. Officers also seized approximately three letters written to Daniel Lively from Tiffany Russell. A review of Daniel Lively's letters, however, reveals that additional letters from Tiffany Russell exist but were not located in or seized at Tiffany Russell's residence. Your affiant submits that there is probable cause to believe that those additional letters from Russell will be among Lively's personal effects in the premises at xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx.

14. During the execution of the search warrant at Tiffany Russell's residence, officers also seized a spiral notebook containing what, based upon my training and experience, I believe to be drug tally sheets and a daily balance ledger documenting drug sales, drug purchases, and other day-to-day expenses. This ledger contains at least four entries titled "Eva Warren" and indicating a repayment of a loan or some other type of financial transaction with Eva Warren.

15. A check with the Washington D.C. Department of Motor Vehicles revealed that Daniel Lively reported xxxxxxxxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON, D.C. as his residence on his driver's license.

16. A check of law enforcement databases reveals that xxxxxxxxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON D.C. is owned by Eva Warren.

17. According to the ATF CI, when he/she purchased drugs from Danny Lively, Lively frequently drove a blue BMW bearing Washington D.C. tags and a burgundy Chrysler with Maryland tags.

18. On or about October 17, 2005, law enforcement observed a blue BMW bearing Washington D.C. license plate number CG5285, which is registered to DANIEL J. LIVELY at xxxxxxxxxxxxxxxxx, WASHINGTON D.C., parked on the street near the residence located at xxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON, D.C. Officers also observed a burgundy Dodge Intrepid bearing Maryland license plates and registered to Tiffany Russell parked on the street in front of xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx.

19. On or about October 18, 2005, I contacted Lt. Stephenson of the Rivers Correctional Institute in Winton, North Carolina, and learned that Daniel Lively was released from the Rivers Correctional Institute on or about July 22, 2005, and provided forwarding address of

xxxxxxxxxxxxxxxxxxxx, WASHINGTON D.C.

20.  On or about October 19, 2005, law enforcement conducted surveillance and saw the previously-mentioned Dodge parked in the same place as it was on October 17, 2005.  Officers did not locate the blue BMW in the vicinity of the residence.

21. On or about October 20, 2005, law enforcement officers conducted surveillance at xxxxxxxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON D.C. and observed two vehicles parked at the rear of the residence registered to Eva Jean Moore Warren.  These vehicles, however, are registered to a Maryland address.  Additionally, this same day, law enforcement officers observed the blue BMW parked in front of the residence.  The Dodge was also there and appeared to be in the same spot as it was on October 17 and 19, 2005.

22. While conducting surveillance on or about October 20, 2005, law enforcement officers observed a black female exit xxxxxxxxxxxxxxxxxxxxxxxxxxxxx and meet with another black male one block away.  The black female (subsequently identified as Eva Warren) then returned to xxxxxxxxxxxxxxxxxxxxxxxxxxxxx with the black male in a blue Hyundai sports utility vehicle.  Eva Warren then began to move items from xxxxxxxxxxxxxxxxxxxxxxxxxxxxx to the Hyundai.  Officers then observed a second black female exit xxxxxxxxxxxxxxxxxxxxxxxxxxxxx and enter the Hyundai. Eva Warren returned to the Hyundai and drove the vehicle south on Chaplin Street and parked around the corner.  Officers then approached the Hyundai and identified its occupants as Eva Warren, Maya Warren and Tyrone Moore.  Law enforcement officers determined that Eva Warren and Maya Warren were the same black females that exited xxxxxxxxxxxxxxxxxxxxxxxxxxxxx earlier that day.

23.  Based on my experience and training, I am aware that:

a.   Drug traffickers commonly maintain at their residence and on their property, books, records, receipts, computer diskettes, computers, notes, ledgers, money orders, and other paper relating to the transportation, purchase, packaging, sale, and distribution of controlled substances.

b.   Drug traffickers commonly maintain in their residences and on their property, paper or books, which reflect the names, addresses, and telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.

c.   Drug traffickers attempt to legitimize the proceeds from the sale of controlled substances. They often accomplish this by using the services of banks and various financial institutions, and real estate brokers. Books and papers relating to such efforts, including but not limited to, cashier checks, money orders, letters of credit and ledgers, are maintained in the residence and on the property of the drug trafficker.

d.   Drug traffickers take, or cause to be taken, photographs of themselves and their associates in the drug trade, property derived from the distribution of narcotics, and their products, and such photographs are often kept in their residence.

e.   Drug traffickers very often buy their assets, including real property and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies and continue to use these assets and to exercise dominion and control over them.

f.   Drug traffickers very often attempt to conceal their assets and currency by storing them at locations other than their own home, including residences of relatives or associates or apartments rented in a fictitious name, to avoid detection and forfeiture by government agencies and continue to use these assets and to exercise dominion and control over them

g.   Controlled substances, including cocaine hydrochloride and cocaine base, commonly known as "crack cocaine," a Scheduled II controlled substance.

h.   Drug traffickers commonly keep packaging materials, scales; owe sheets, and other drug paraphernalia in their residence and on their property.

1.   Based upon the facts and opinions set forth above, I believe probable cause exists that articles constituting contraband, evidence of the crime, fruits of the crime, instruments of the crime, concerning violations of Title 21, United States Code, Section 841(a) and 846, namely conspiracy to distribute controlled substances, will be found in the residence of xxxxxxxxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON, D.C.

2.   Wherefore, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I respectfully request a warrant to search and authority to seize at the premises located at xxxxxxxxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON, D.C those items identified in Attachment A.

_____
DARIN RAMSEY, Special Agent
Bureau of Alcohol, Tobacco and Firearms

Sworn and subscribed to before me this 20th day of October, 2005.

_____
DEBORAH A. ROBINSON, Magistrate Judge
United States District Court
 For the District of Columbia

## ATTACHMENT A

1. Books, records, receipts, notes, ledgers, letters, correspondence and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

2. Address and telephone books and papers reflecting names, address and telephone numbers.

3. Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashiers checks, the obtaining, secreting, transfer, and concealment of assets in the obtaining, secreting, transfer, concealment and expenditure of money.

4. Electronic equipment, such as telephone answering machines, telephone paging devices, currency counting machines, cellular or mobile telephones and any information stored in memory or contained in any related hardware and software.

5. Photographs, in particular, photographs of conspirators, of assets, and controlled substances, and other documents identifying associates and conspirators.

6. Indicia of occupancy, residence, and ownership of the premises, including but not limited to, utility and telephone bills, canceled envelopes, and keys.

7. Any locked or closed container(s) believed to contain any of the above listed evidence.